## IN RE HAMILL

[No. 94, September Term, 1970.]

*Decided December 29, 1970.*

The cause was argued before MURPHY, C.J., and MORTON and MOYLAN, JJ.

*Edward D. E. Rollins, Jr.,* and *Judson P. Garrett, Jr.,* for appellant.

*Francis X. Pugh, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General,* and *Donaldson C. Cole, Jr., State's Attorney for Cecil County,* on the brief, for appellee.

MURPHY, C.J., delivered the opinion of the Court.

On October 17, 1969, Leigh Ann Hamill, age 17, a boarding student at a private high school in Cecil County, sold two bags of marihuana to an undercover police officer, Trooper Tommy L. Bays of the Maryland State Police, as a result of which Bays petitioned the court to find Leigh a delinquent child under Maryland Code (1969 Supp.) Article 26, Sections 70 through 70-26. At the juvenile hearing held January 30, 1970, Leigh, through her counsel, advised the court that the facts in the juvenile petition would not be contested. On this foundation the court found Leigh a delinquent child. It then proceeded to consider the appropriate disposition to be made in the case, and Leigh was called to testify in this connection. She stated that she had the marihuana secluded in her room at school; that she had smoked it on a number of occasions, usually with friends; that because the school administrators were searching rooms, she decided to rid herself of the marihuana; that her roommate told her that she had a friend who wanted to buy some marihuana; that a meeting was arranged by the roommate on the school campus and she sold the marihuana to her

roommate's friend, not knowing who he was. Leigh testified that she had offered to give the marihuana to the man; that she had never sold marihuana before; that she realized it was against the law to possess marihuana; and that she tried LSD on two occasions but did not like it.

Upon completion of Leigh's testimony, the juvenile judge stated:

> "Well, I do not know whether or not I am going to confine this girl or not. It is going to depend on my confirmation when I talk to Officer Bays. If she is telling the truth about her dealings with Officer Bays, that will be one thing. If she is lying, that will be something else * * * *"

Trooper Bays then testified. He confirmed most of Leigh's testimony but denied that she offered to give him the marihuana without payment. He stated that Leigh wanted to sell it and that she had set the price, which he paid; and that she insinuated that she might have additional "stuff" (marihuana) for future sale.

Leigh's father testified, and acknowledged that his daughter was a problem. He said that he and his wife had tried for several years to "reach" Leigh and "show her what is right"; that since her arrest her conduct had been exemplary and her behavior had greatly improved. Mr. Hamill conceded "we have a long ways to go." He was, however, confident that Leigh could be rehabilitated "without sending her away."

The report of the Juvenile Probation Department, received in evidence, disclosed in general that Leigh's parents were religious, financially secure, lived in a nice home, with no children other than Leigh living with them (one boy being away in the Marine Corps); that Mr. Hamill was a strict disciplinarian "with little show of outward emotion"; that Leigh "feels that her parents have undue expectations of her and that her father particularly is unwilling to bend"; that a "lack of communication" existed between Leigh and her family; and that the family

had sought psychiatric and psychological help for Leigh. The report noted that Leigh seemed "more remorseful at having been caught selling the drug than in having used it occasionally." It concluded by offering the opinion that Leigh "has learned a lesson from this experience and will not be before the Court again," and that the family "should receive family counseling as had been previously sought out." The record further disclosed that as a result of her marihuana sale to Trooper Bays, Leigh was asked to and did leave school in November of 1969; that she then went to work as a clerk with an insurance company and in that capacity worked for several months prior to her juvenile hearing; that she also attended school, several nights weekly, to obtain her high school diploma; and that she hoped to pursue a career in commercial art or interior decorating.

Upon completion of closing arguments of counsel, the court rendered its disposition, stating:

> "The court certainly has some grave responsibilities in cases of this sort, from the standpoint of all elements of society that are involved, the community, the children, the girl that is charged with being delinquent here, the parents, all of these things have to be considered. The evidence in this case is that this girl of superior intelligence—incidentally, who should know if anyone should know better—has sold marijuana in one of the schools of our county while a member of one of the schools. The evidence is uncontradicted and undisputed that she had an intimation at least that she would be getting some more stuff in, which another deal might be arranged, which indicates more than just a single incident. The Court realizes full well that it is a calculated risk to commit a girl of this age and that there is a possibility of danger to her and to her future; but there is certainly a greater danger to society and that danger is so great

> that the court believes that the risk must be taken; and therefore disposition of this case is that this girl, Leigh Ann Hamill, be committed to the Montrose School for Girls for an indefinite period."

On appeal from this disposition, appellant Hamill contends that (1) the court erroneously disposed of the matter solely on the basis of the offense without regard to her rehabilitative needs, and (2) that the court erred in conducting its own examination of a witness out of the presence of appellant and her counsel.

The law of this State governing juvenile causes and delinquent children was substantially revised by Chapter 432 of the Acts of 1969. The purposes of the Act were plainly outlined, in part, as follows (Article 26, Section 70):

> "(1) To provide for the care, protection and wholesome mental and physical development of children coming within the provisions of this subtitle;
> (2) To remove from children committing delinquent acts the taint of criminality and the consequences of criminal behavior, and to substitute therefor a program of treatment, training, and rehabilitation consistent with the protection of the public interest;
> (3) To place a child in a wholesome family environment whenever possible;
> (4) To separate a child from his parents only when necessary for his welfare or in the interests of public safety."

By so providing it is clear that the Legislature intended no departure in philosophy from that underlying previous juvenile court enactments in Maryland, as interpreted by the Court of Appeals, *viz.*, that juvenile proceedings are of a special nature designed to meet the problems peculiar to the adolescent (*In re Fletcher*, 251 Md. 520); that the

proceedings of a juvenile court are not criminal in nature and its dispositions are not punishment for crime (*In The Matter of Cromwell,* 232 Md. 409) ; that the juvenile law has as its underlying concept the protection of the juvenile, so that judges, in making dispositions in juvenile cases, think not in terms of guilt, but of the child's need for protection or rehabilitation (*In re Johnson,* 254 Md. 517) ; that the juvenile act does not contemplate the punishment of children where they are found to be delinquent, but rather an attempt to correct and rehabilitate them in "a wholesome family environment whenever possible," although rehabilitation may have to be sought in some instances in an institution (*Moquin v. State,* 216 Md. 524).

Under Section 70-1 (y) of the present juvenile law, the disposition hearing held following an adjudication of delinquency is "to determine (1) whether the child is in need of supervision, treatment, or rehabilitation; and if so (2) the nature of the supervision, treatment, or rehabilitation." Under Section 70-19, the juvenile judge is enjoined to "make disposition as most suited to the physical, mental, and moral welfare of the child." These principles must be applied in light of the purposes of the juvenile law, as set forth in Section 70 (heretofore outlined), *viz.,* that the juvenile court is to make disposition so as to provide for the care, protection, and wholesome mental and physical development of the child; by a program of treatment, training and rehabilitation "consistent with the protection of the public interest."

Against such a legislative and judicial background, it is altogether clear that the *mere* fact of delinquency, without more, ordinarily does not justify the taking of the child from his parents and his commitment to a State training school. Because the Legislature has indicated its preference that a delinquent child be placed in the care, custody, and control of individuals rather than an institution whenever consistent with the purposes underlying the juvenile law, a commitment to a training school in a case where the parents would seem able and willing

to undertake the rehabilitation of the delinquent child would be improper. *See Cantu v. State*, 207 S.W.2d 901 (Tex.); *In re Walter*, 172 N.W.2d 603 (N.D.); *Berry v. Superior Court*, 245 P. 409 (Wash.); 47 Am.Jur.2d *Juveniles and Delinquent and Dependent Children,* Section 30; Annotations, 45 A.L.R. 1533 and 85 A.L.R. 1099. Of course, where the evidence at the disposition hearing shows that the parents, no matter how well motivated or intentioned, are incapable, unwilling, or unable to control or rehabilitate their delinquent child, a commitment to the training school may be necessary for the "welfare [of the delinquent] or in the interests of public safety" (Section 70(4)).

Maryland Rule 913 provides that if the disposition hearing results in "placement of the child outside his home, the court shall * * * file with the clerk a brief statement of the reasons why such placement is necessary." In compliance with this Rule, the juvenile judge stated his belief that the delinquent's conduct in selling the marihuana to Trooper Bays, and the "intimation" that she would make like sales in the future, was such that, balancing the interests of the child against the danger to society caused by her delinquent conduct, the commitment was deemed necessary. It is not apparent that the juvenile judge, in so concluding, gave proper weight to the testimony of the father and the opinion of the juvenile probation department that it seemed unlikely that Leigh would offend again. On the cold record before us, there is nothing that would seem to indicate, nor is there anything to suggest that Leigh's physical, mental, and moral welfare would be served by separating her from her parents and committing her to the training school. *Cf. In The Matter of Cromwell, supra,* involving indifferent parents and physical danger to the child unless confined in a juvenile institution.

The matter of disposition in a juvenile case is committed to the sound discretion of the juvenile judge, to be disturbed on appeal only upon a finding that such discretion has been abused. *In The Matter of Cromwell, su-*

*pra.* We find evidence of an abuse of discretion in failing to weigh the evidence as to probable rehabilitation outside an institution and remand the case without affirmance or reversal for further consideration by the juvenile judge. In the course of such reconsideration, it may be proper that the judge review Leigh's conduct since her original disposition hearing, as well as the efforts made by her parents during this interim period to bring about her rehabilitation.[1]

> *Case remanded without affirmance or reversal for further proceedings in accordance with this opinion; costs to be paid by appellant.*

---

1. In view of our disposition of the appeal, it will not be necessary to consider appellant's contention that it was improper for the juvenile judge to confer privately with Trooper Bays prior to rendering his decision.