## IN RE DAVID ARNOLD AND BRIAN NICHOLUS ARNOLD

[No. 618, September Term, 1970.]

*Decided June 25, 1971.*

The cause was argued before THOMPSON, MOYLAN, POWERS, CARTER and GILBERT, JJ.

*Joseph P. McCurdy,* with whom were *Philip H. Goodman* and *Goodman, Meagher & Enoch* on the brief, for appellants.

*George A. Eichhorn, III, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General,* and *J. Thomas Clark, State's Attorney for Queen Anne's County,* on the brief, for appellee.

GILBERT, J., delivered the opinion of the Court.

The Appellants, brothers, were both charged with being delinquents in Queen Anne's County Juvenile Court petitions. The petitions alleged that they "did assault and beat Barbara Lee Currens, age 12, with a stick." They entered a general denial and both boys on November 4, 1970 were adjudged to be delinquent and were committed to the Maryland Training School.

The boys' parents had been served on October 24, 1970 with a petition charging that each of the children was a delinquent.[1] Both boys executed, in court, a "Waiver of Consent and Election Not to Contest".[2] Their father, Richard Arnold, consented, in writing, to his children's waiver.

On appeal, a twofold attack is made: (1) the Appellants were denied the right to counsel because a waiver had been signed by the father who alleged he had been told "that the proceedings would not result in the commitment of the Appellants," and (2) that the commitment was contrary to the express purposes of Article 26, Section 70, of the Maryland Code.

The testimony established that on October 5, 1970, David Arnold (David), age 13, and Brian Nicholus Arnold (Nicky), age 11, were playing at the Bay City Community Beach in Queen Anne's County. Barbara Lee Currens, age 12, in company with other children, was also at the beach. Barbara testified, "See, we were over on the Community Beach playing, and then we saw this rope on the tree hanging down and we were swinging on it. It was my turn so there was a boy in front and there was a boy on the side. The boy in front of me said a couple of bad words, and get off the rope. I said, 'no.'

---

1. The 1970 Cumulative Supplement to Vol. 9B, Annotated Code of Maryland, pages 325 and 326, sets forth Form 31 as the suggested Petition and contains more information than the one used in this case. Form 31 was added Feb. 2, 1970.

2. We note that the form "Waiver of Consent and Election Not to Contest" was adopted prior to the enactment of Chapter 432, Acts of 1969, (Art. 26, Sec. 70).

The boy on the side of me hit me so I jumped down. * * * I jumped down and grabbed his hand and told him to drop the stick. So, he did, and his brother came and hit me on the back. While the other was walking I got hold of the other who hit me on the back."

She then related that she had been struck "around five times"; that the Appellants had taken turns hitting her. Miss Currens stated she struck the boys with her fist. She identified both boys as her assailants. She said she lost no time from school as a result of the assault. Her total medical expenses were $6.00 and consisted of treatment by a physician for a cut on the back and a tetanus shot. Her clothing was not damaged.

Jane Austin, a witness, told substantially the same version of the incident, except for the fact that, "David said it was their swing and we better get off or else they were going to hit her over the back with a stick. So, he picked up the stick and hit Barbara with it, so, she got down and grabbed his hand so he stopped." Jane then stated that while Barbara was fighting with David that Nicky picked up the stick and hit Barbara. The witness informed the court that she told everybody [the other children present] "Let's help." She looked for a stick but by the time she located one David and Nicky were running home. Jane and Barbara proceeded to locate Barbara's mother, and with her drove to the Arnold home. In response to the knock the boys opened the door. Mrs. Currens asked to talk to Mrs. Arnold, but was informed she was not at home. When Mrs. Currens invited the brothers to come outside of the house and to look at her daughter's back in order that she might show them what they had done, Nicky said, "Why don't you shut your damn mouth." He then shut the door. Mrs. Currens, Barbara and Jane went to the police station and lodged their complaint against the Arnold boys. Neither Mr. nor Mrs. Arnold ever contacted Mrs. Currens relative to the assault, and there is no evidence that they knew about the incident until they were notified by the probation department.

Mr. Arnold denied any knowledge of the incident and explained that his wife was not at home on October 5, 1970, the day of the offense, because she was at a doctor's office. Neither boy testified.[3] The court asked for the report of the probation officer, which was apparently received into evidence, and the probation officer informed the court that Mr. John Walker, the principal of the Stevensville Middle School, wanted to say something. Mr. Walker testified as to the Appellants' absences from school; that David "was doing well for his ability and was cooperative in class" but that "Nicky is not doing as well academically as we feel he could do"; that he was concerned with the fact that Nicky had caused disruptive behavior in class, was ejected from an assembly for similar behavior and that he had had a number of fights with students. Nicky had only been in that school since September, 1970. Mr. Walker stated that Nicky had used other students to do things for him such as going off the campus grounds for cokes and that he had spoken to Nicky about the matter. The following took place:

"THE COURT: Nicky is supposed to be one of the worst discipline problems in the school."[4]

"THE WITNESS: Nicky is a problem. I have never —"

"THE COURT: That's the way he is classified in this report."[5]

"THE WITNESS: Is that my report, sir? I haven't rated him as to who is worst, but Nicky has been a discipline prob-

---

3. Rule 917. "A child may remain silent as of right during an adjudicatory hearing on an allegation of delinquency and shall be so advised."

4. This is an apparent reference to the Probation Department report which attributes this comment to the school guidance counselor.

5. Although not argued here, Rule 912 (c) requires: "The rules of evidence applicable to criminal cases shall apply to delinquency hearings." The probation report was received into evidence before a finding of delinquency.

lem and taken a great deal of my time."

"THE COURT: All the Court wants to say at this point to you, Mr. Walker, is that the first time such conduct as appears to have been present in this case manifests itself to you in your capacity get in touch with Mr. Horwath. They only have to misbehave once as far as the Court is concerned. We're not going to put up with it; we will back you up."

Then Mr. Walker continued his testimony and told the court that Nicky sometimes wore a hat to class which he removed when told and later put it back on; that he had trouble getting Nicky to keep his shirt-tail in and that if Nicky's behavior did not improve he would have to suspend him. He said that the parents had not attended P.T.A. meetings, or the school "open house". Mr. Arnold, in a combination of testimony and cross-examination again denied he knew of the incident, or any disruptive behavior caused by the boys in the school. In fact, Mr. Arnold said, "Like I said, I never knew anything about it until now."

The Appellants, in support of their first contention, inform us that the father, Mr. Richard Arnold, alleges that he had been told by the probation officer that "the proceedings would probably not result in commitment." Then they argue that if the waiver executed by the brothers, and consented to by their father, was in any way procured in reliance upon this alleged misstatement, such a waiver would not be intelligently made, and, consequently, invalid.

At the time of the commencement of the hearing, the juvenile judge asked Mr. Arnold whether or not he wished an attorney. His answer was "no." The probation

officer stated that he had been assured that they [the Arnolds] would want counsel if the matter went to court. Mr. Arnold said, "We did at the time." The court asked that the waivers be signed, saying, "Have Mr. Arnold execute the waivers. Go over it with him and have him execute those waivers."

We have carefully reviewed the record in this proceeding and fail to find any testimony, argument or inference to support the Appellants' position, and, in fact, the Appellants fail to direct our attention to anything in their own support except an inference which they believe may be drawn from the fact that the father asked at the conclusion of the hearing if there was "a chance of appeal on their part until I can get an attorney. I didn't realize it was going to be this serious." The belated realization of the seriousness, and the desire to employ counsel, does not lead us to conclude that the Appellants' father was in any way misled by the probation department. There is nothing in the record to indicate that the waiver was not voluntarily and knowingly signed.

We shall now consider the second argument presented by the Appellants; that is, that the trial court committed the Appellants contrary to the express purpose of Article 26, Section 70, of the Annotated Code of Maryland.

*In Re Hamill,* 10 Md. App. 586, 590 (1970), contains a comprehensive discussion of the Maryland juvenile law. Chief Judge Murphy in that case said:

> "The law of this State governing juvenile causes and delinquent children was substantially revised by Chapter 432 of the Acts of 1969. The purposes of the Acts were plainly outlined in part as follows:
>
> '(1) To provide for the care, protection and wholesome mental and physical development of children coming within the provisions of this subtitle;
>
> (2) To remove from children committing

delinquent acts the taint of criminality and the consequences of criminal behavior, and to substitute therefor a program of treatment, training, and rehabilitation consistent with the protection of the public interest;

(3) To place a child in a wholesome family environment whenever possible;

(4) To separate a child from his parents only when necessary for his welfare or in the interest of public safety.'

"By so providing, it is clear that the Legislature intended no departure in philosophy from that underlying previous juvenile court enactments in Maryland, as interpreted by the Court of Appeals, *viz.*, that juvenile proceedings are of a special nature designed to meet the problems peculiar to the adolescent (*In Re Fletcher*, 251 Md. 520) ; that the proceedings of a juvenile court are not criminal in nature and its dispositions are not punishment for crime (*In the Matter of Cromwell*, 232 Md. 409) ; that the juvenile law has as its underlying concept the protection of the juvenile, so that judges, in making dispositions in juvenile cases, think not in terms of guilt, but of the child's need for protection or rehabilitation (*In Re Johnson*, 254 Md. 517) ; that the juvenile act does not contemplate the punishment of children where they are found to be delinquent, but rather an attempt to correct and rehabilitate them in 'a wholesome family environment whenever possible,' although rehabilitation may have to be sought in some instances in an institution (*Moquin v. State*, 216 Md. 524).

"Under Section 70-1(y) of the present juvenile law, the disposition hearing held following an adjudication of delinquency is 'to determine (1) whether the child is in need of super-

vision, treatment, or rehabilitation; and if so (2) the nature of the supervision, treatment, or rehabilitation.' Under Section 70-19, the juvenile judge is enjoined to 'make disposition as most suited to the physical, mental, and moral welfare of the child.' These principles must be applied in light of the purposes of the juvenile law, as set forth in Section 70 (heretofore outlined), *viz.*, that the juvenile court is to make disposition so as to provide for the care, protection, and wholesome mental and physical development of the child; by a program of treatment, training and rehabilitation 'consistent with the protection of the public interest.'

"Against such a legislative and judicial background, it is altogether clear that the *mere* fact of delinquency, without more, ordinarily does not justify the taking of the child from his parents and his commitment to a State training school. Because the Legislature has indicated its preference that a delinquent child be placed in the care, custody, and control of individuals rather than an institution whenever consistent with the purposes underlying the juvenile law, a commitment to a training school in a case where the parents would seem able and willing to undertake the rehabilitation of the delinquent child would be improper. See *Cantu v. State,* 207 S.W.2d 901 (Tex.) ; *In re Walter,* 172 N.W.2d 603 (N.D.) ; *Berry v. Superior Court,* 245 P. 409 (Wash.) ; 47 Am.Jur.2d *Juveniles* and *Delinquent and Dependent Children,* Section 30; Annotations, 45 A.L.R. 1533 and 85 A.L.R. 1099. Of course, where the evidence at the disposition hearing shows that the parents, no matter how well motivated or intentioned, are incapable, unwilling, or unable to control or rehabilitate their delinquent child, a commitment to the training school may be necessary for the 'wel-

fare [of the delinquent] or in the interest of public safety.' (Section 70 (4) )."

Appellants point to *Hamill* and Maryland Rule 913. They argue that the juvenile judge did not comply with Rule 913, nor is there a showing that he considered "welfare of the children" or "public safety."

At the conclusion of the testimony in this case the court said:

"All right, stand up boys. Now, the Court is not at all pleased with what has been presented here this morning as to your conduct. Nor are we satisfied with the apparent indifference of the parents to their conduct. The fact that you say you don't know anything about what they have been doing is certainly an indication that you haven't been paying attention to what these children have been doing. The fact that your wife is not here this morning, although she may have a job, the Court thinks she should be here.

"Now, we're not going to put up with such conduct as this in any community in this county. Certainly we're not going to permit these children, although they're young, to behave as they have been, from what Mr. Walker said and what these reports show. And, certainly the fact that you don't know anything about this certainly shows indifference on your part.

*"Now, boys you're both going to be sent to the Maryland Training School for an indefinite period.* I hate to do it with boys your size and age because it's rough over there, but you deserve it when you go around beating people the way you have, and misbehaving the way you have in school." (Emphasis supplied).

"MR. CLARK: *Have you made a finding?"* (Emphasis supplied).
"THE COURT: *The finding is delinquent in*

*both cases.* You will also pay the costs of this proceeding, whatever that might be. You will also pay the lady for the medical bill. * * *." (Emphasis supplied).

The Rules for Juvenile Causes, (Chapter 900) Maryland Rules of Procedure, provide that there shall be an adjudicatory hearing and at the conclusion thereof "the court shall announce and dictate to the stenographer or reporter or prepare and file with the clerk a brief statement of the grounds upon which it bases its determination." Rule 912 d 1.

After the "adjudicatory hearing" there shall be a "disposition hearing." Rule 913; *In Re Hamill,* supra.

The proceedings in this case do not comply with the Maryland Rules of Procedure, and as Mr. Justice Fortas, *In the Matter of Gault,* 387 U. S. 1, said, quoting Foster, *Social Work, the Law, and Social Action, in Social Casework,* (July, 1964), page 286, "Procedure is to law what 'scientific method' is to science."

In the recent case of *Isen v. Phoenix Assurance Co.,* 259 Md. 564, 570 (1970), the Court of Appeals, speaking through Judge McWilliams, said of the Maryland Rules:

"* * * they are not guides to the practice of law but precise rubrics 'established to promote the orderly and efficient administration of justice and [that they] are to be read and followed.' *Brown v. Fraley,* 222 Md. 480, 483 (1960)."

Here the adjudicatory hearing (Rule 912) and disposition hearing (Rule 913) are interwoven. The Appellants were actually ordered committed to the Maryland Training School before they were adjudged "delinquent". The hearing before the juvenile judge was violative of the Rules.

The probation report submitted to the juvenile court stated in part:

"In summation, I feel after reviewing school reports, considering the present incident where two brothers beat a girl their own age with sticks because she refused to vacate a swing for them, the extensive records of fights and anti-social behavior in the school and community, the lack of motivation on the part of the parents to accept help when offered and the continued protection by the parents even when the problem is obvious, that Brien, regarding his age and development, cannot be entirely responsible for his delinquency. I feel it is an outgrowth of continued parent protection, lack of supervision and blame of others for his action.

"RECOMMENDATION

It is respectfully recommended to the court that if Brien (Nicky) is found delinquent, he be placed on probation, under the supervision of the Department of Juvenile Services. I would also respectfully recommend that the court make the parents abundantly aware that custody can and quite possibly will be changed in any future appearance by the family in Juvenile Court. If the parents refuse the counseling by the school and the Department of Juvenile Services, I feel foster placement with full support ordered by the family the only alternative to probation."

The summation and report as to David is identical except for the proper noun of "David" in place of "Brian" (Nicky) where the same may appear. The trial judge ignored the recommendation and in doing so, we think failed to give proper effect to Sections 70 and 70-1 of Article 26.

By the enactment of Chapter 432, Acts of 1969, the General Assembly created a wholly new category en-

titled "Child in Need of Supervision." [6] This new classification contains most of the acts defined as "delinquency" under former Section 52 of Article 26.[7]

On the bare record before us there is no showing that the legislative design was weighed or considered by the juvenile judge, nor does the record disclose to us how the children's "welfare" or "the interests of public safety" (Article 26, Section 70 (4)) would be best served by commitment to the Maryland Training School.

Incarceration of these youthful Appellants in an institution is fraught with grave consequences for they will be uprooted from their family, friends and classmates, and exposed to association with delinquents who have committed serious felonies including rape, manslaughter and armed robbery, *inter alia*, and is not in keeping with the legislative intent.

We are not unmindful that, "disposition in a juvenile case is committed to the sound discretion of the juvenile judge, to be disturbed on appeal only upon a finding that

6. Article 26, Sec. 70-1, defines a "delinquent child" to mean "a child who commits a delinquent act, and who requires supervision, treatment or rehabilitation." "Delinquent act" is defined in the same section and Article (g) as "an act which is in violation of Article 66½ of this Code, any other traffic violation, or an act that would be a crime if done by a person who is not a child.
   "(i) Child in need of supervision means a child: (1) Subject to compulsory school attendance who is habitually and without justification truant from school; (2) Without substantial fault on the part of his parents, guardian, or other custodian, who is habitually disobedient, ungovernable, and beyond their control; (3) Who so deports himself as to injure or endanger himself or others; or (4) Who has committed an offense applicable only to children; and (5) Requires guidance, treatment, or rehabilitation."
7. Article 26, Sec. 52, which was repealed by Chapter 432 of the Acts of 1969, supra, and had defined a delinquent child as "a child (1) who violates any law or ordinance; or who commits any act, which, if committed by an adult, would be a crime not punishable by death or life imprisonment; (2) who is incorrigible or ungovernable or disobedient or who is beyond the control of his parents, guardian, custodian or other lawful authority; (3) who is habitually a truant; (4) who without just cause or without the consent of his parents, guardian or other custodian, repeatedly deserts his home or place of abode; (5) who is engaged in any occupation which is in violation of law; or association with immoral or vicious persons; (6) who so deports himself so as to injure or endanger himself or others."

such discretion has been abused." *Hamill,* supra. We find an abuse of discretion by the juvenile judge in failing to consider "a program of treatment, training and rehabilitation consistent with the protection of public interest" (Article 26, Section 70, supra) and we remand the case without either affirming or reversing for further consideration by the juvenile court.

As we said in *Hamill,* supra, "In the course of such reconsideration, it may be proper for the judge to review the minor Appellants' conduct since the original hearing and to consider the legislative purposes as stated in Article 26, Section 70."

> *Case remanded without affirming or reversing for further proceedings in accordance with this opinion.*
> *Costs to be paid by the County Commissioners of Queen Anne's County.*
> *Mandate to issue forthwith.*