## MATTER OF DAVID EARL WOOTEN

[No. 134, September Term, 1971.]

*Decided December 2, 1971.*

---

522

The cause was argued before MURPHY, C. J., and THOMPSON and CARTER, JJ.

*Elsbeth L. Bothe* for appellant.

*Robert A. DiCicco, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Milton B. Allen, State's Attorney for Baltimore City,* and *Timothy Seidel, Assistant State's Attorney for Baltimore City,* on the brief, for appellee.

MURPHY, C. J., delivered the opinion of the Court.

Appellant David Earl Wooten, a sixteen year old, eleventh grade high school student, was charged on the petition of Mrs. Virginia Markel with being a delinquent child in that on October 31, 1970 he assaulted her by "closing her arm in her automobile door, and by striking her repeatedly about the left breast and ribs." After a hearing on March 11, 1971 before the Division for Juvenile Causes of the Circuit Court of Baltimore City, appellant was adjudged a delinquent child and committed to the Maryland Training School for Boys. He contends on this appeal (1) that the evidence was insufficient to support a finding of delinquency, and (2) that the court erred by committing him to a training school.

At the juvenile hearing Mrs. Markel testified to the following: On the evening of October 31, 1970 she was driving with her daughter and three of her friends when the car directly in front of her came to a sudden stop, forcing her to swerve to avoid a collision. One of the children in her car, Debbie McClure, shouted out to the driver of the stopped vehicle, who was later determined to be the appellant, that he was going to kill someone. Immediately thereafter, appellant began to pursue the Markel automobile and attempted to ram into it. Mrs. Markel stopped her vehicle when she saw a cab driver; she sought his aid in calling the police, and he told her to get back into her car. At that point, the appellant arrived on the scene, emerged from his vehicle and came rushing over to Mrs. Markel. He slammed the car door on her hand, struck her in the chest and screamed profanities at her. He claimed that she had hit him with an egg. Two men then drove up and Mrs. Markel called to them for help. They pulled the appellant away from her, after which the appellant got into his car and left. Mrs. Markel was later taken to the hospital by her husband. She was treated then and on later occasions by her personal physician for injuries sustained as a result of the incident.

Thomas Hopkins testified that he observed the appellant pushing against the door of Mrs. Markel's vehicle and swinging his hands at her. He stated that Mrs. Markel yelled for help. He observed that appellant's eyes were "glassy" and that he was speaking in a loud voice at the time of the incident.

Debbie McClure and her brother Steven, both passengers in the Markel car, generally corroborated Mrs. Markel's version of the incident.

The appellant testified in his own behalf. He stated that he followed Mrs. Markel's car after someone in it had thrown an egg at him. He said he had stopped at the curb when the Markel vehicle passed by and he thought it was a "bunch of kids." He denied attempting to ram the Markel car. He testified that when Mrs. Markel finally stopped her vehicle, he stopped his, got out and went over to it; that Mrs. Markel opened the door, slamming it into him, after which she got out of her car and began hitting him; that he grabbed her arms but let go when two men came over to the car. He claimed he acted in self-defense. He denied using profane language. He told the court he had never been in trouble before and did not use alcohol or drugs except on one occasion shortly before the trial when he unknowingly had taken LSD.

Appellant's girlfriend Mary Klima, a passenger in his car at the time of the incident, testified that an egg was thrown from the Markel car and that when appellant went over to her car, Mrs. Markel began pushing and shoving him. She stated that appellant never used alcohol or drugs but when questioned by the court, admitted she knew of the incident when he had taken LSD.

Appellant's mother and father testified on behalf of their son. Each said he was a fine son and gave them no trouble. Mrs. Wooten testified that their family relationship was a good one, and that their son was well liked both at school and in their neighborhood. Mr. Wooten told the court that he would abide by the court's directives and do anything he could by way of supervising his

son should the court in fact determine his son a delinquent. In addition to the appellant, who lived with them, the Wootens had two other children; both were adults and neither resided with the Wootens. Appellant had no juvenile or criminal record. He worked part time after school at a gasoline station.

At the conclusion of the hearing, the court found appellant to be a delinquent child, as charged in the petition. It concluded that the testimony of Thomas Hopkins, "a completely impartial, disinterested witness," was fully corroborative of Mrs. Markel's testimony. The court stated that it disbelieved the appellant's version of the incident. The court characterized appellant's assault upon Mrs. Markel as atrocious and expressed a belief that appellant was under the influence of drugs at the time of the incident.

Immediately following its adjudication that appellant was a delinquent child, the court determined to commit him to a training school. In the course of giving reasons for its disposition, the court stated that the appellant's parents gave the "impression of being very wonderful people, very decent, honorable and respectable" and that because of appellant's middle class advantages he "should be held to a higher degree of accountability" for his actions.

## I

Appellant's contention that the evidence was legally insufficient to support the delinquency finding is without merit. Maryland Code, Article 26, Section 70-18(a), provides that the fact of delinquency must be proved beyond a reasonable doubt. It is, of course, well established that credibility of witnesses is a matter for the trier of fact. In this case, the record shows that the court believed the testimony of Mrs. Markel and that of her corroborating witnesses and disbelieved appellant. We think such testimony plainly established the requisite elements under Maryland Code, Article 26, Section 70-1(g)(h) for a finding of delinquency; thus, we cannot say that

the court was clearly erroneous in its finding. Maryland Rule 1086.

## II

Appellant contends that the juvenile judge, in determining to commit him to a training school, violated the procedures and ignored the principles governing juvenile causes set forth in Article 26, Section 70 through 70-26 and in Chapter 900 of the Maryland Rules of Procedure. He argues that Maryland law provides for a disposition hearing separate and distinct from the delinquency adjudication hearing at which evidence relevant solely to the appropriate disposition to be made in the case shall be received and considered by the juvenile judge. He claims not to have been afforded such a hearing and contends that in any event the court's decision to commit him to a training school was in contravention of the governing precepts set forth in the cases of *In Re Hamill*, 10 Md. App. 586 and *In Re Arnold*, 12 Md. App. 384.

That a disposition hearing separate and distinct from the delinquency adjudication hearing is required subsequent to the finding of delinquency is plainly mandated by Article 26, Section 70-17 and by the provisions of Maryland Rules 912 (The Adjudicatory Hearing) and 913 (Disposition Hearing). The reason for such a bifurcated process is equally clear. The adjudicatory hearing is solely to determine the merits of the allegations of delinquency. Section 70-17. The disposition hearing is to determine whether the delinquent child is in need of "supervision, treatment, or rehabilitation" and, if so, the nature required. Section 70-1(y). Consistent with that determination the juvenile judge is enjoined by Section 70-19 to "make disposition as most suited to the physical, mental and moral welfare of the child." To assist the court in making a proper disposition, Section 70-14(a) contemplates that it will direct a probation officer or other qualified agency to make a study and report to it "concerning the child, his family, his environment,

and other matters relevant to the disposition of the case." Section 70-14(c) provides that as part of such study the child or his parents may be examined by a physician, psychiatrist, psychologist or other professionally qualified person.

The court in the present case did not conduct a separate disposition hearing within the contemplation of Section 70-17 and Rule 913. Immediately upon the conclusion of the adjudicatory hearing, it gave a detailed recital of its reasons for believing that appellant assaulted Mrs. Markel. The court stated that appellant's conduct was atrocious and constituted an act of extreme violence. It expressed the belief that appellant may have been under the influence of drugs at the time of the assault; that he was a belligerent and hostile person; and that his demeanor upon the court finding him delinquent showed that he was "an extremely argumentative type of person." The court stated that even though appellant had no prior criminal or juvenile record, it did not share the philosophy that everybody "has an automatic right to one bite out of the apple." The court stated that unlike children from the ghetto areas of the City who had neither fathers and/or mothers, appellant had both parents and many advantages that ghetto children did not have. The court then announced its determination to commit appellant to a training school; in doing so, it stated that it could not treat appellant differently than it treated ghetto children who committed similar acts of extreme violence.

We said in *Hamill* that juvenile proceedings are of a special nature designed to meet the problems peculiar to the adolescent; we said that the proceedings of a juvenile court are not criminal in nature and that its dispositions are not punishment for crime; we said that the juvenile law has as its underlying concept the protection of the juvenile, so that judges, in making dispositions in juvenile cases, think not in terms of guilt, but of the child's need for protection or rehabilitation; we said that

the juvenile court is to make dispositions so as to provide for the care, protection and wholesome mental and physical development of the child by a program of treatment, training and rehabilitation consistent with the protection of the public interests. We said in *Arnold*, repeating our holding in *Hamill*, that the mere fact of delinquency does not by itself warrant commitment of a juvenile to a training school. Indeed, to otherwise conclude would render meaningless the high-sounding provisions of the juvenile law which entreat the juvenile judge in making disposition not to think in terms of the juvenile's guilt, not to punish him for his delinquent acts, but rather to assess his need for supervision, treatment, or rehabilitation and thereafter make disposition under Section 70-19 "most suited to the physical, mental and moral welfare of the child."

We think the juvenile judge in this case failed fully to appreciate and apply these principles in taking appellant from his parents and committing him to a training school. He neither sought nor provided an opportunity for the introduction of evidence to assist him in making a proper disposition under Section 70-19. The court had no reports nor information concerning appellant, his family or his home environment other than that adduced during the delinquency stage of the proceedings. However relevant the nature of the delinquent act and the circumstances surrounding its commission may be in making a proper disposition, those factors cannot be applied without regard to, or wholly apart from, the child's best interests and those of the public viewed in light of the purposes underlying the juvenile law. In other words, to make disposition "most suited to the physical, mental and moral welfare of the child" under Section 70-19 requires that the juvenile judge consider more than the delinquent act itself, no matter how extreme or violent it may have been. On the record before us, we conclude that the court's determination to commit appellant to a training school was not reached in conformity with the procedural requirements of the law governing juvenile

dispositions, nor was it based on sufficient information or knowledge to justify it. Moreover, the record fails to reflect that the court, in making its disposition, had in mind that Maryland law clearly contemplates the retention of a delinquent child in his home where possible, consistent with his own as well as the public interests.[1] We noted in *Hamill,* at pp. 591-592, that the Legislature has indicated its preference that a delinquent child be placed in the care, custody and control of individuals, rather than an institution whenever consistent with the purposes underlying the juvenile law, and that a commitment to a training school in a case where the parents would seem able and willing to undertake the rehabilitation of the delinquent child would be improper. As was the case in both *Hamill* and *Arnold,* the record before us contains nothing to indicate or suggest that appellant's physical, mental and moral welfare would be served by separating him from his parents and committing him to a training school. Recognizing that the matter of disposition in a juvenile case is committed to the sound discretion of the juvenile judge, to be disturbed on appeal only upon a finding that his discretion has been abused, we find an abuse of discretion in this case requiring that we remand it without affirmance or reversal for further consideration by the juvenile judge with respect to the proper disposition to be made. In the course of such reconsideration, we think it appropriate that the court hear evidence concerning the appellant's conduct and behavior from the time of his delinquent act to the time of the hearing on remand, including his public school records, his training school records, as well as evidence re-

---

1. Two of the legislative purposes underlying enactment of the juvenile statute, set forth in Section 70(3) and (4), expressly refer to the accomplishment of this objective, *viz.*

    (3) "To place a [delinquent] child in a wholesome family environment whenever possible.

    (4) "To separate a [delinquent] child from his parents only when necessary for his welfare or in the interests of public safety."

**530**

lating to his family background and of the efforts made by appellant's. parents to bring about his rehabilitation.[2]

> *Judgment adjudicating appellant a delinquent child affirmed; case remanded without affirmance or reversal for further proceedings in accordance with this opinion with respect to the matter of the proper disposition to be made; one-half of the costs to be paid by appellant and one-half of the costs to be paid by the appellee.*

---

2. At a bail hearing held one month after appellant's commitment to the training school, the juvenile judge indicated that his commitment was based on the belief that appellant's parents did not provide the controls or discipline necessary for appellant's supervision, and that there was an atmosphere of over-protectiveness on the parents' part. We noted in *Hamill* that where the evidence at the disposition hearing shows that the parents, no matter how well motivated or intended, are incapable, unwilling or unable to control or rehabilitate their delinquent child, a commitment to the training school may be necessary for the child's welfare or in the interests of public safety. Should the evidence at the remand hearing indicate that the Wootens are incapable, unwilling, or unable to control or rehabilitate the appellant, then such a disposition might be proper. But such a determination must be supported by evidence and reason and applied with full appreciation for the law's preference for retention of the delinquent in his own home.