## MATTER OF GEORGE ROBERTS

[No. 132, September Term, 1971.]

*Decided December 17, 1971.*

The cause was argued before ANDERSON, MOYLAN and GILBERT, JJ.

*Patrick G. Cullen* for appellant.

*James L. Bundy, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Milton B. Allen, State's Attorney for Baltimore City,* and *Michael Glushakow, Assistant State's Attorney for Baltimore City,* on the brief, for appellee.

MOYLAN, J., delivered the opinion of the Court.

The appellant, George Roberts, at that time a twelve year old, 7th grade student at the Pimlico Junior High School, was charged on the petition of Joseph E. Maddox, the Security Officer at that school, with being a delinquent child in that on April 7, 1970, he "assaulted and beat by jumping on his back, knocking him to the ground, and choking him, David Horowitz." Significantly, the petition was not filed until November 19, 1970, seven months after the alleged assault. After a hearing on March 31, 1971, one week short of a full year after the alleged assault, before the Division for Juvenile Causes of the Circuit Court for Baltimore City, the appellant was adjudged to be a delinquent child and was committed to the custody of the Department of Juvenile Services for transfer to the Boys' Village. He contends on this appeal that the court erred by committing him to a training school.

We are constrained to agree. The very presence of his case upon the docket of the Juvenile Court, suggests some answer as to why those courts, nationally, are suffering under almost untriable caseloads. The appellant here had no record of prior experience of any sort with the courts. The incident which gave rise to this case was, under any interpretation, a "schoolboy fight." The fight

occurred immediately outside the Pimlico Junior High School within minutes after the "last bell" had dismissed the pupils for the day on April 7, 1970. The appellant, who at the time of trial was thirteen years of age and weighed 93 pounds, was on the day of the fight twelve years of age and weighed between 83 and 85 pounds. The alleged victim of the assault, David Horowitz, on the day of the fight was also twelve years of age and weighed approximately 150 pounds. David was a Little League baseball player. Some three years earlier, the appellant and David had been classmates in the fourth grade at the Fallstaff Elementary School. At the time of the fight, they were, although no longer classmates, both students in the seventh grade at the Pimlico Junior High School. Their lockers were located in the same corridor but were separated from each other by the width of that corridor.

The incident that ultimately escalated into the fight occurred some few minutes before school was dismissed for the day, when the students were permitted to go to their lockers immediately before returning to their homerooms to be dismissed. David shared a locker with a fellow student. For some ill-defined reason, David and his locker partner had a disagreement about the opening of the locker. According to David, mere words were exchanged between them. According to the appellant, David pushed his locker partner. In any event, the appellant interjected himself into the dispute on the side of David's locker partner and ordered David "to stop pushing him around." At that point, it was incumbent upon all of the students to return to their respective homerooms.

As they were parting company, it is clear that there was some contact on the part of David directed toward the appellant. According to David himself, the appellant and several other persons were standing in his way as he attempted to proceed into the door of his classroom and his contact amounted to nothing more than pushing his way through. According to the appellant, as soon as he had ordered David not to push his locker partner,

David immediately crossed the corridor, pushed the appellant and started laughing. Whether the contact at which the appellant took umbrage was as recited in the former version or as in the latter version, it is clear that the appellant responded to that contact with the words, "Wait until you get outside." A few minutes later, the last bell rang and the students left the school for the day. When David got outside, the appellant was waiting for him. Once the boys were outside the school building, the appellant, whether in response to a real or an imagined provocation, was clearly the aggressor. Fortuitously for David, his mother was parked a few feet away to drive him home from school. As he exited the building, there was eye contact between him and his mother. Mrs. Horowitz and David give one version of the fight which ensued; the appellant gives another. There were no other witnesses.

According to David and his mother, the appellant approached David initially from the rear, grabbed him by the neck and "flipped" him down. David then got up and pushed the appellant out of his way. David picked up his books, which had fallen to the ground, and started walking. The appellant grabbed him a second time, by the shoulders, and pulled him down again. The appellant grabbed David around the neck and banged his head onto the concrete "four or five" times.

According to the appellant, he approached David from the front and said, "David, I told you when I get outside I was going to hit you back." He then hit David. He testified that David then saw his mother in the car and "started going wild with me." The two then wrestled each other to the ground. The appellant testified that they were on the grass and not on concrete. He asserted that they went to the ground only one time instead of twice, that they both were exchanging blows, that he was hit on the neck at least once by David, but at the moment the fight ended, it was he (the appellant) who was on top.

The fight was ended by the timely intervention of Mrs. Horowitz. It is clear that she grabbed the appellant from behind and pulled him off of her son and that she then carried him to Mr. Maddox, the school Security Officer. All versions of the intervention coincide, except for the additional detail asserted by the appellant that Mrs. Horowitz "had her fingernails down in my neck" and that, despite his protestations that he knew how to walk, "she kept them in there until we got to the office."

David and his mother both testified that he suffered a broken foot, contusions and a sprained neck. David acknowledged that his head was not cut or bleeding and that he received no stitches. He acknowledged that the contusions complained of consisted of a scrape on the inside of his wrist that required neither stitches nor bandaging. He acknowledged that he received no medical treatment for the sprained neck but that it was sore when he tried to use it. Mrs. Horowitz testified that she took her son to a Dr. Baitch, an orthopedic doctor, and that he placed a cast on David's right foot which remained on for four or five weeks. She testified that she paid a medical bill to Dr. Baitch of $125. It was David who testified that his foot had been broken and that the damage to his foot had occurred when he "fell the first time."

Mr. Maddox, the Security Officer, testified that at about 2:35 p.m. on April 7, 1970, Mrs. Horowitz brought the appellant to him, explained that he had just attacked her son, and indicated that "she wanted action taken." Mr. Maddox sent the appellant into the building and told him to wait there until his parents had been notified of the difficulty. Mr. Maddox further testified that it is not his policy to file juvenile petitions in cases such as this unless there is a weapon involved or unless "parents insist that I press charges." There was clearly no weapon involved in this case. Mr. Maddox indicated that the petition here was filed because of parental insistence.

We do not question the finding of the court below that

the actions of the appellant technically constituted an act of delinquency since those same actions, if committed by an adult, would technically have constituted an assault. It is rather the disposition, commitment to a training school, which gives us pause.

We think the trial court was initially in error in not holding a separate dispositional hearing distinct from the adjudicatory hearing on the question of delinquency. As Chief Judge Murphy said for this Court in the case of *Matter of Wooten*, 13 Md. App. 521:

> "That a disposition hearing separate and distinct from the delinquency adjudication hearing is required subsequent to the finding of delinquency is plainly mandated by Article 26, Section 70-17 and by the provisions of Maryland Rules 912 (The Adjudicatory Hearing) and 913 (Disposition Hearing). The reason for such a bifurcated process is equally clear. The adjudicatory hearing is solely to determine the merits of the allegations of delinquency. Section 70-17. The disposition hearing is to determine whether the delinquent child is in need of 'supervision, treatment, or rehabilitation' and, if so, the nature required. Section 70-1(y). Consistent with that determination the juvenile judge is enjoined by Section 70-19 to 'make disposition as most suited to the physical, mental and moral welfare of the child.' To assist the court in making a proper disposition, Section 70-14 (a) contemplates that it will direct a probation officer or other qualified agency to make a study and report to it 'concerning the child, his family, his environment, and other matters relevant to the disposition of the case.' Section 70-14(c) provides that as part of such study the child or his parents may be examined by a physician, psychiatrist, psychologist or other professionally qualified person."

In addition to and probably because of the procedural defect inherent in the disposition before us here for review, we hold that all of the factors were not considered that should go into a proper determination of what disposition to make of a juvenile adjudged to be delinquent. In the case of *In Re Hamill*, 10 Md. App. 586, we said, at 591, "(T)he mere fact of delinquency, without more, ordinarily does not justify the taking of the child from his parents and his commitment to a State training school." In *Hamill*, again in the case of *In Re Arnold*, 12 Md. App. 384, and in *Wooten, supra*, we pointed out that judges should, "in making dispositions in juvenile cases, think not in terms of guilt, but of the child's need for protection or rehabilitation; we said that the juvenile court is to make dispositions so as to provide for the care, protection and wholesome mental and physical development of the child by a program of treatment, training and rehabilitation consistent with the protection of the public interests." *Wooten, supra*.

In the instant case, the trial judge did not have the benefit of any information about the background of the appellant here, about his home life and his parents, about his school record, nor about any of those things which would aid in a determination of whether or not he was a fit candidate for rehabilitation. Nor did he, we feel, bear in mind, in making a disposition, that the Maryland law clearly contemplates the retention of a delinquent child in his home wherever possible, if that is consistent with his own as well as the public interest. *In Re Hamill, supra*, at 591-592. Two of the legislative purposes underlying enactment of the now-governing juvenile statute are set forth in Sections 70(3) and 70(4) and expressly articulate the objective as:

"(3) To place a [delinquent] child in a wholesome family environment whenever possible.

(4) To separate a [delinquent] child from his

> parents only when necessary for his welfare or in the interests of public safety."

It appears clear, in the instant case, that the trial judge based his disposition primarily on the nature of the delinquent act itself and, seemingly to some extent at least, on conditions generally in this school and in other schools:

> "I am aware of the fact that I believe that this was the first time that George has been in this court, or in a court, however, I do not subscribe to the theory that everybody is entitled to one bite out of the apple. I think it depends on what that bite is, and I don't believe anybody is entitled to the kind of bite of a brutal assault of this nature resulting in serious injuries to this boy, and which could have resulted in far more serious injuries, when a boy's head is being bashed against concrete several times, it could lead to very serious injuries. Fortunately, in that respect, those injuries didn't develop here . . . .
> I am aware of the testimony and I, myself, cannot treat lightly these kinds of aggressive assaults, unprovoked assaults of innocent people, and I recall the testimony also that when David looked up, there were boys surrounding him, and I think that we are unfortunately witness to, in our schools, and around our schools, are so extremely serious with violent acts, wherein, children are just innocent victims of these attacks. We are beyond the area of physical harm that is being done to the children, we have a climate of fear on the part of these children when they go to school, and they have to go there and live there in an atmosphere of fear, where they are afraid to do certain things in and around the school, where they are afraid to go to certain places in and about the school, where

the parents each day are plagued with fears when the child leaves the home; what may happen to him, is he going to be safe, is he not going to be safe. This terrible atmosphere of fear that we have in our schools today is a horrible thing, and it is the kind of act which is leading directly to that, and it is leading, I might say, to a very rapid erosion of the quality of our school system, because we are seeing parents of both races, wherever they are able to, to get their children out of the public school system to get them into private schools, to get them into the counties because of the great fear of the climate in our public schools today, and this, to me, is a terrible commentary on the course that our public school system is taking now with regard to the quality of the young people who are being taken out of it.

I don't expect anybody to be remorseful of the things he can do, but he admitted he committed an assault. I see here no remorse, or regret on the part of the Respondent. I think he is trying to lie his way out of this thing and paint an untrue picture. And for these reasons, I am going to commit him to the Department of Juvenile Services for committment to the appropriate training school."

We feel here, as we did in *Wooten:*
"However relevant the nature of the delinquent act and the circumstances surrounding its commission may be in making a proper disposition, those factors cannot be applied without regard to, or wholly apart from, the child's best interests and those of the public viewed in light of the purposes underlying the juvenile law. In other words, to make disposition 'most suited to the physical, mental and moral welfare of the child' under Section 70-19 requires that the juvenile judge consider more than the delinquent

act itself, no matter how extreme or violent it
may have been. On the record before us, we con-
clude that the court's determination to commit
appellant to a training school was not reached
in conformity with the procedural requirements
of the law governing juvenile dispositions, nor
was it based on sufficient information or knowl-
edge to justify it."

The record before us contains nothing to indicate or
suggest that the appellant's physical, mental and moral
welfare would be served from separating him from his
parents and committing him to a training school. We feel
that this case should be remanded without affirmance or
reversal for further consideration by the juvenile judge
with respect to the proper disposition to be made. In the
course of such reconsideration, we think it appropriate
that the court hear evidence concerning the appellant's
conduct and behavior from the time of his delinquent act,
in April of 1970, to the time of the hearing on remand,
including his public school record, as well as evidence re-
lating to his family background.

> *Judgment adjudicating appel-
> lant a delinquent child af-
> firmed; case r e m a n d e d
> without affirmance or re-
> versal for further proceed-
> ings in accordance with
> this opinion with respect to
> the matter of the proper
> disposition to be made.*