CALVIN EDWARD THOMAS *v.* STATE OF
MARYLAND

[No. 182, September Term, 1974.]

*Decided June 13, 1974.*

The cause was argued before MORTON, MOYLAN and GILBERT, JJ.

*John W. Sause, Jr., District Public Defender,* with whom was *Floyd L. Parks* on the brief, for appellant.

*Gilbert Rosenthal, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General,* and *Richard R. Cooper, State's Attorney for Kent County,* on the brief, for appellee.

GILBERT, J., delivered the opinion of the Court.

On March 29, 1974 the appellant, Calvin Edward Thomas, a fifteen year old, appeared at the trial of Larry Anthony Moody. Moody was charged with the robbery and larceny of a watch. Appellant faced the identical charges in the same court because the juvenile court had waived jurisdiction over him on December 20, 1973, although the appellant's case before the Circuit Court had not come on for trial inasmuch as he had entered an appeal to this Court from the waiver order.[1]

We have attached to this opinion Appendix A, which is part of the transcript of both the Moody trial and the appellant's subsequent contempt hearing. It would be superfluous to set forth in the text of this opinion the divers acts of the appellant that led to the contempt citation. Suffice it to say that the conduct of appellant, as reflected by Appendix A, leads to the inescapable conclusion that appellant so conducted himself as to demean the orderly administration of justice, depicted his contempt for the

---

1. Matter of Calvin Thomas, No. 968, Sept. Term, 1973. For authority to appeal from the waiver order *see* In Re Trader, 20 Md. App. 1, A. 2d (1974), *cert. granted,* Court of Appeals, April 17, 1974. After oral argument in this Court on appeal No. 968, the Court of Appeals granted *certiorari* on its own motion May 28, 1974. *See* Courts and Judicial Proceeding Article, § 12-203.

Circuit Court for Kent County, was rude, discourteous, disrespectful, disruptive, defiant and irascible even after being warned by Judge George B. Rasin that if appellant persisted he would be cited for contempt. The appellant did persist, was cited, adjudged guilty and sentenced to 179 days in the County Jail. Judge Rasin, at the outset of the contempt proceeding, stated that he thought an "appropriate punishment" to be "some deprivation of . . . freedom, for some period of time that would be less than 6 months, which would not require a jury trial." [2]

In *Roll v. State, supra* at 48, we said:

"As direct contempts are those which occur in the presence of the court or so near to the court as to interrupt its proceedings, the judge is usually an observer of or has personal knowledge of the facts." [3]

Augustine Birrell, *In the Name of Bodleian: Contempt of Court*, wrote:

"An ill-disposed person may exhibit contempt of court in divers ways — for example, he may scandalize the court itself, which may be done not merely by the extreme measure of hurling missiles at the presiding judge, or loudly contemning his learning or authority, but by ostentatiously reading a newspaper in his presence, or laughing uproariously at a joke made by someone else. Such contempts, committed as they are *in facie curiae*, are criminal offences, and may be punished

---

2. In Roll v. State, 15 Md. App. 31, 288 A. 2d 605 (1972), *modified on other grounds*, 267 Md. 714, 298 A. 2d 867 (1973), we observed at 49,
    ". . . that in criminal contempts, both direct and constructive, where the sentence imposed is not petty, that is the sentence imposed is 6 months or more, the alleged contemnor is entitled to a trial by jury, thus restricting, in the case of direct criminal contempts, the power of the court to inflict punishment summarily." (footnote omitted).
If, however, the Legislature were to prescribe a penalty for contempt of court and the maximum sentence is 6 months or more, the alleged contemnor would be entitled to a jury trial irrespective of the fact that the sentence imposed was less than 6 months. *See* Roll v. State, *supra* at n. 13.

3. *See* Md. Rule P1(a).

> summarily by immediate imprisonment without the right of appeal.[4] It speaks well both for the great good sense of the judges and for the deep-rooted legal instincts of our people that such offences are seldom heard of. It would be impossible nicely to define what measure of freedom of manners should be allowed in a court of justice, which, as we know, is neither a church nor a theatre, but, as a matter of practice, the happy mean between an awe-struck and unmanly silence and free-and-easy conversation is well preserved."

Without attempting to define the "measure of freedom of manners . . . allowed in a court of justice", we think it indubitable that reasonable men would agree that appellant's conduct during the Moody trial was contemptuous, and that appellant carried such conduct forward into his own contempt hearing. Appellant's contention that his "gestures were merely to get the attention of the Court so that he might testify; and his hostility was simply based upon an inner attitude toward a system which he felt was prejudicial" [5] does not excuse him from patently disdainful conduct. We find no merit in appellant's assertion that "there is no factual support for the finding of contempt."

An outcrop of appellant's contemptuous conduct poses an additional question of whether a juvenile who commits a direct contempt of a Circuit Court can be summarily adjudged in contempt or must be referred to a juvenile court for a waiver or delinquency hearing.

By Laws 1969, Ch. 432, § 2,[6] the General Assembly set forth the legislative purpose of "Juvenile Causes". Those purposes are:

---

**4.** An appeal is allowed in this State. *See* Courts Art. § 12-304 and § 12-402.

**5.** Appellant's statement is not too far afield from that of Arthur Schopenhauer (1788-1860) who, in *Studies in Pessimism. Psychological Observations* (as translated by T. Bailey Saunders), said: "Hatred comes from the heart; contempt from the head; and neither feeling is quite within our control."

**6.** Now codified as Courts Art. § 3-802.

"(1) To provide for the care, protection, and wholesome mental and physical development of children coming within the provisions of this subtitle;

(2) To remove from children committing delinquent acts the taint of criminality and the consequences of criminal behavior, and to substitute therefor a program of treatment, training, and rehabilitation consistent with the protection of the public interest;

(3) To place a child in a wholesome family environment whenever possible;

(4) To separate a child from his parents only when necessary for his welfare or in the interest of public safety;

(5) To provide judicial procedure for carrying out the provisions of this subtitle.

This subtitle shall be liberally construed to effectuate these purposes."

This Court in the case of *In re Hamill*, 10 Md. App. 586, 271 A. 2d 762 (1970), in commenting upon the purpose of the Act said, at 590-91:

". . . [T]he Legislature intended no departure in philosophy from that underlying previous juvenile court enactments in Maryland, as interpreted by the Court of Appeals, *viz.*, that juvenile proceedings are of a special nature designed to meet the problems peculiar to the adolescent (*In Re Fletcher*, 251 Md. 520 [, 248 A. 2d 364 (1968)]); that the proceedings of a juvenile court are not criminal in nature and its dispositions are not punishments for crime (*In the Matter of Cromwell*, 232 Md. 409 [, 194 A. 2d 88 (1963)]); that the juvenile law has as its underlying concept the protection of the juvenile, so that judges, in making dispositions in juvenile cases, think not in terms of guilt, but of the child's need for protection or rehabilitation (*In Re Johnson*, 254 Md. 517 [, 255 A. 2d 419 (1969)]); that

the juvenile act does not contemplate the punishment of children where they are found to be delinquent, but rather an attempt to correct and rehabilitate them in 'a wholesome family environment whenever possible,' although rehabilitation may have to be sought in some instances in an institution (*Moquin v. State,* 216 Md. 524 [, 140 A. 2d 914 (1958)])."

*See also In re Arnold,* 12 Md. App. 384, 278 A. 2d 658 (1971).

Courts Art. § 1-501 provides that:

" . . . Each [Circuit Court] has full common-law and equity powers and jurisdiction in all civil and criminal cases within its county, and all the additional powers and jurisdiction conferred by the Constitution and by law, except where by law jurisdiction has been limited or conferred exclusively upon another tribunal."

By § 3-804 of the Courts Art. it is further, in pertinent part, provided:

"(a) The [juvenile] court has exclusive original jurisdiction over a child alleged to be:
(1) Delinquent;
(2) Dependent;
(3) Neglected;
(4) In need of supervision; or
(5) Mentally handicapped."

In his argument to this Court, appellant contends that the above quoted provisions of the Courts Article and *Hamill,* demonstrate that juvenile courts have exclusive jurisdiction over persons under the age of 18 years who commit an act that would be a crime if committed by an adult, and, inasmuch as direct contempt, if committed by an adult would be a crime, the appellant, a juvenile, must be proceeded against in a juvenile court. We do not share that view.

Courts Art. § 1-202 provides:

> "(a) *Exercise of Power* — A court may exercise the power to punish for contempt of court or to compel compliance with its commands in the manner prescribed by the Maryland Rules or Maryland District Rules." [7]

The Maryland Rule concerned with the procedure for punishment of direct contempt is P3 (a). That Rule states:

> "a. *Summary Punishment:*
>
> A direct contempt may be punished summarily by the court against which the contempt was committed."

The fundamental reason why a court possesses the power to punish for contempt is not to protect the personage of the judge from real or imagined injury to his pride or dignity, but to assure the proper conduct of the orderly administration of justice over which the judge has been designated to preside. *Helmore v. Smith*, 35 Ch. D. 449, 455 (1887). If we were to adopt appellant's point of view that Judge Rasin had no authority to dispose summarily of the *in facie curiae* contempt by a juvenile, we would erode the authority of the judge to conduct court proceedings in an orderly manner, strip a trial court of its right to deal with contemptuous, disruptive juvenile witnesses, render nugatory Md. Rule P3(a) in its application to juveniles and throw open wide the door to conduct creating chaotic courtroom conditions. We think the Legislature, in the adoption of the "Juvenile Causes Act", never intended to deprive the courts of their authority to punish for direct contempt, those who commit such an act, be they juvenile or adult.

We hold that Courts Art. § 3-804 a conferring exclusive original jurisdiction over a juvenile is inapplicable to a case of direct contempt committed in another court and that the

---

7. This section extended the scope of former Md. Ann. Code Art. 26, § 4 which was limited to direct contempt. *See* Hitzelberger v. State, 173 Md. 435, 196 A. 288 (1938).

court in which the contempt occurs possesses full power to deal with the contemptuous juvenile in the same manner as it would any adult person who had committed a similar offense. Apparently only four other jurisdictions having statutes conferring "exclusive jurisdiction" over juveniles upon the juvenile court, have been confronted with the question of whether a juvenile may be punished for direct contempt by the court in which the contempt is committed, *Bryant v. State*, 256 Ind. 587, 271 N.E.2d 127 (1971), *In Re Williams*, 306 F. Supp. 617 (D.D.C. 1969), *Application of Balucan*, 44 Hawaii 271, 353 P. 2d 631 (1960), *Young v. Knight*, 329 S.W.2d 195, 77 A.L.R.2d 994 (1959), and each has arrived at the same conclusion as do we.

Although we have held herein that trial judges may summarily punish juveniles for direct contempt, they, however, should bear in mind, in meting out punishment, that they are dealing with a juvenile.

Lastly, the appellant contends that Judge Rasin should not have conducted the contempt proceeding inasmuch as he was the judge who was reviled by appellant. To support his argument appellant cites *Mayberry v. Pennsylvania*, 400 U. S. 455, 91 S. Ct. 499, 27 L.Ed.2d 532 (1971), and attacks *State v. Roll*, 267 Md. 714, 298 A. 2d 867 (1973). In *Mayberry*, at the end of a twenty-one day trial, the judge found Mayberry guilty of eleven criminal contempts and sentenced him to "not less than one nor more than two years for each of the 11 contempts or a total of 11 to 22 years." The Supreme Court of Pennsylvania affirmed in a split decision, 434 Pa. 478, 255 A. 2d 131 (1969). The Supreme Court of the United States granted *certiorari*. During the course of Mayberry's trial he hurled a series of opprobrious epithets at the trial judge including such remarks as, "You dirty sonofabitch"; "You ought to be Gilbert and Sullivan the way you sustain the district attorney every time he objects to the questions"; "[You are a] dirty, tyranical old dog"; "I ask your Honor to keep your mouth shut while I'm questioning my own witness"; "What are you working for? The prison authorities, you bum?"; "Go to hell. I don't give a good God damn what you suggest, you stumbling dog"; "You started

all this bullshit"; "This isn't the Spanish Inquisition" and remarks of similar ilk all patently calculated to vilify and defile the trial judge. The Court, speaking through Mr. Justice Douglas said, at 462-63:

> "These brazen efforts to denounce, insult, and slander the court and to paralyze the trial are at war with the concept of justice under law. Laymen, foolishly trying to defend themselves, may understandably create awkward and embarrassing scenes. Yet that is not the character of the record revealed here. We have here downright insults of a trial judge, and tactics taken from street brawls and transported to the courtroom. This is conduct not 'befitting an American courtroom,' . . . and criminal contempt is one appropriate remedy."

The Court further stated, at 466:

> "Insults of that kind are apt to strike 'at the most vulnerable and human qualities of a judge's temperament.' *Bloom v. Illinois*, 391 U. S. 194, 202."

The Court concluded that the facts in *Mayberry* required that the "defendant in criminal contempt proceedings should be given a public trial before a judge other than the one reviled by the contemnor."

We find *Mayberry* to be factually inapposite. There the contemnor was the accused conducting his own defense. Here the appellant was a "self-subpoenaed" witness in Moody's case. Moreover, the remarks made by appellant in the case now before us, while contemptuous, do not reach the high water mark of *Mayberry*. *Mayberry* does not hold that in all cases of contempt committed *in facie curiae* the trial judge is *ipso facto* disqualified from conducting the contempt proceeding. Both *Mayberry* and *Roll* suggest that if the judge waits until the end of the trial, however, before he proceeds against the contemnor it is the better practice to have a different judge conduct the contempt hearing. Criminal contempt proceedings before another judge are mandated, however, only in those extreme situations where

the "personal stings" delivered by the contemnor are of such intensity, as in *Mayberry, supra,* as to cast a reasonable suspicion that the trial judge would conduct the contempt proceeding in a vindictive manner in order to sate his own personal grievance against the contemnor. Obviously each case must be judged by its own facts. Our perusal of the record in the instant case convinces us that Judge Rasin did not proceed against the appellant out of revenge, malice, or any other unworthy motive, nor do we perceive any reason why he should have disqualified himself. In fact, the record demonstrates that the judge not only conducted the contempt proceedings with dispatch, after the contempt had occurred, but exercised an admirable "Jobian" restraint.

We find nothing in *State v. Roll, supra,* that is in conflict with *Mayberry.* In *Roll, supra,* Judge Digges said, at 733:

> "And, while not required, when a judge waits until the end of the trial, it is generally wise to ask a fellow judge to rule on the nature of the conduct of the contemnor if it has in it elements of personal attack upon the judge."

*Mayberry* used substantially the same words. Mr. Justice Douglas stated, at 463-64:

> "Where, however, he [the trial judge] does not act the instant the contempt is committed, but waits until the end of the trial, on balance, it is generally wise where the marks of the unseemly conduct have left personal stings to ask a fellow judge to take his place."

*Judgment affirmed.*

### APPENDIX A.

"(Friday, March 29th, 1974 proceedings during Moody trial)

1

(Judge [George B.] Rasin asked the Court to inquire of a man seated in the Court Room what his name was, as he had been making a disturbance in the Court Room while Officer

Mullins was testifying. Mr. Pinder stated the man said he would not give his name to anyone unless he was told whether he would be put on the witness stand or not. Judge Rasin then told the Jury we would be taking a recess at this time. Judge Rasin then asked if the Officer in the Court Room would take the man into custody for a moment. The jury went to their Jury Room.)

* * *

Judge Rasin: Who is he?

Deputy Metcalfe: Calvin Thomas.

Judge Rasin: That's Calvin Thomas?

Deputy Metcalfe: Yes sir. Chum Chum. He's known as Chum Chum.

Judge Rasin: Now Mr. Thomas, you may remain in the Court Room and watch the proceedings, but you are not to hold your hands up, you are not to point to anyone, you are not to say anything to anybody. Otherwise we will have to remove you. Because I didn't know what all these gyrations were that you were going through, holding your hand up like that, and doing like that. Spectators can watch, but they are not to raise any questions as to what the case is all about. If you just want to watch it you —

Calvin Thomas: May I get on the stand? Because the watch is mine. It's not Larry's. The watch is mine.

Mr. Campen [Moody's defense counsel]: I will call the man as a witness.

Judge Rasin: You will call him as a witness?

Mr. Campen: Quite obviously, I will ask him to be held as a material witness.

Judge Rasin: Alright. Then Sheriff, will you take him into custody and keep him available as a witness in this case, outside the Court Room, since all witnesses have been sequestered.

Calvin Thomas: Man, I can take myself.

Judge Rasin: Has he got the shakes or something?

Calvin Thomas: That's right. I do.

(Mr. Thomas was taken from the Court Room. After recess the Moody case was continued. During the Defense Case, Mr. Campen called Calvin Thomas as his witness.)

Judge Rasin: Come inside the rail please, Mr. Thomas. Mr. Parks, are you his attorney?

Mr. Parks: Yes, Your Honor.

\* \* \*

Clerk: Raise your right hand. Your right hand.

Calvin Thomas: Oh, right hand.

Clerk: Do you solemnly promise and declare under penalty of perjury the testimony you give the Court and the Jury in the matter now pending will be the truth, the whole truth, and nothing but the truth?

Mr. Thomas: I don't swear, but I will tell the truth.

Mr. Clerk: You will affirm?

Mr. Thomas: Dig ya'man!

\* \* \*

Mr. Parks: At this juncture I would like the record to show . . . I have advised [appellant] of his right not to testify in this case, and to answer any questions that may tend to incriminate him, about any matters that may tend to incriminate him. But I would request that the Court further advise him.

Judge Rasin: Mr. Thomas, —

Mr. Thomas: Yes?

Judge Rasin: There are charges pending against you —

Mr. Thomas: I know it, Mr. Rasin.

Judge Rasin: Now wait a minute. You listen to me. You have a Constitutional right not to say anything that might —

Mr. Thomas: Incriminate me.

Judge Rasin: Incriminate you, that is, could be used against you at your trial.

Mr. Thomas: I know what it means.

Judge Rasin: And your attorney, Mr. Parks, is here. He says that he has advised you, and now the Court is advising

you, that you do not have to testify, that is you don't have to answer —

Mr. Thomas: I know that. I know what my rights are.

Judge Rasin: Just a moment. Just a moment, Mr. Thomas. You don't have to answer any questions that could possibly get you into trouble later on for your own trials. Now you have a perfect right to answer if you want to, but you don't have to answer. Now you say you understand your rights? Is that correct?

Mr. Thomas: I dig it.

Judge Rasin: Now let me ask you this. Have you consumed any alcohol within the last 24 hours?

Mr. Thomas: What kind? Rubbing alcohol? Dig it!

Judge Rasin: Any kind of alcohol — rubbing alcohol, or beer, or wine, or any kind of whiskey?

Mr. Thomas: Or reefers? No. I haven't.

Judge Rasin: No alcohol?

Mr. Thomas: No alcohol.

Judge Rasin: Have you smoken — have you smoked any marijuana, or reefers, or joints, or whatever you call them —

Mr. Thomas: No.

Judge Rasin: — within the last 24 hours?

Mr. Thomas: In the last 24 days.

Judge Rasin: No, in the last 24 hours.

Mr. Thomas: No, not in the last 24 hours.

Judge Rasin: Have you taken any kind of drugs or narcotics —

Mr. Thomas: Dope?

Judge Rasin: — pills, dope, or anything else —

Mr. Thomas: Dope?

Judge Rasin: — within the last week?

Mr. Thomas: Is marijuana a dope?

Judge Rasin: Marijuana is classified as a dangerous substance.

Mr. Thomas: No, I didn't take no dope in a week.

Judge Rasin: Have you had any pills at all?

Mr. Thomas: No.

Judge Rasin: Any kind of pills?

Mr. Thomas: The doctor might fool me, so I don't fool with him.

Judge Rasin: I am asking you, have you taken any pills at all, whether they were given to you by a doctor or anybody else?

Mr. Thomas: No pills.

Judge Rasin: No pills?

Mr. Thomas: No pills.

Judge Rasin: Have you taken any liquid medicine —

Mr. Thomas: Since what?

Judge Rasin: Within the last — any kind of liquid medicine?

Mr. Thomas: Water? Yes, I have taken water.

Judge Rasin: Liquid medicine.

Mr. Thomas: Is water a liquid medicine?

Judge Rasin: No, water isn't a liquid medicine.

Mr. Thomas: Right. You need water to stay alive. I have consumed water in my body.

\* \* \*

Mr. Cooper [State's Attorney for Kent County]: Your Honor, I would like to move for contempt proceedings in the antics he is displaying before the Jury at this particular time.

Mr. Thomas: Man —

Judge Rasin: Alright. I'll deal with that later. Alright, now, do you know what you are doing at this time, Mr. Thomas?

Mr. Thomas: No, I want him to explain what I am doing.

Judge Rasin: Do you know what you are doing? I mean you are —

Mr. Thomas: I am supposed to be answering questions.

Judge Rasin: Are you ready to do that? Are you capable of doing that?

Mr. Thomas: I've been ready, man.

Judge Rasin: Alright. Go ahead, Mr. Campen.

586

## DIRECT EXAMINATION BY MR. CAMPEN:

Q: I am going to show you what has been marked State's Exhibit #6 —

A: A watch. That's mine.

Q: Did you at any time ever give it to Larry Moody?

A: I did let Larry Moody use it.

Q: Did you tell him it was yours at the time?

A: I told him — what, do you mean I stole it? No man, the watch is mine. Dig it!

Q: No further questions, Your Honor.

A: Dig it!

Judge Rasin: Any cross-examination, Mr. Cooper?

Mr. Cooper: Yes.

## CROSS-EXAMINATION BY MR. COOPER:

Q: Where did you get the watch from?

A: Man that might incriminate me on my next case. I'm not going to answer that question.

Q: I think you had better answer it.

A: Oh, I'd better answer it? Then I'm going to have to answer then.

Judge Rasin: No, you don't have to answer if you don't want to.

A: Alright. That's what I want to do.

Judge Rasin: Okay. You're claiming the 5th Amendment?

A: What's that?

Judge Rasin: The right not to testify against yourself.

A: Is that the 5th?

Judge Rasin: That's the 5th Amendment privilege.

A: Then that's what I'm declaring, man.

Judge Rasin: That's what you're declaring? Alright. He declines to answer on the basis that he might incriminate himself.

Q: The State strenuously objects for this reason —

A: I got the watch from a white boy for $5.00 man. That answers your question.

Q: Will you instruct the witness —

A: I answered your question, man.

Q: Will you ask him to remain silent while I make my argument?

Judge Rasin: Yes, would you remain silent, Mr. Thomas —

A: Yes sir, Mr. Rasin.

Judge Rasin: — while the State's Attorney addresses the Court?

· A: Yes sir, Mr. Rasin.

Q: When the witness was asked a certain question concerning the watch then he leaves himself open to cross-examination concerning the watch. One of the elements in receiving stolen goods is knowing it was stolen.

A: What if it wasn't stolen?

Judge Rasin: Mr. Thomas, will you keep quiet?

A: Oh, excuse me, Mr. Rasin.

Q: It is quite an injustice for him to testify and then turn around and not give the State the opportunity to go into that particular testimony.

A: I did tell you where I got the watch. I stole it. Or — I bought it — from a white boy. Dig it!

Judge Rasin: Proceed, Mr. Cooper.

Q: Now — you said you stole it?

A: And I also said I bought it. Let's get everything straight, man.

Q: And you bought it for $5.00?

A: From a white boy. And his name is Tony Emore. Now go pick him up.

Q: How long have you known Larry Moody?

A: Since boyhood.

Q: And how long would that have been?

A: About — say since boyhood. Right?

Q: Well, 3 or 4 years?

A: Cool it. Let's put it — yeah, let's put it that way.

Q: Well the, you knew him when he worked for Kent County News, then? As a paper boy for Kent County News?

588

A: I remember when he was a paper man.

Q: For Kent County News?

A: For Chester River Press. Dig it!

\* \* \*

Q: You didn't tell him you had taken this watch from Kent County News?

A: 'Cause I didn't have any reason to tell him that I had taken this watch from Kent County News. Dig it!

Q: And you just let him use it, is that right? Use the watch?

A: Didn't I say the watch was mine?

Q: Well, what —

A: "Mine" means Calvin Thomas, man.

Q: For what purpose did he want the watch?

A: Stealing?

Q: I don't know —

A: Stealing or taking time?

Q: Why did he —

A: Do you have a watch on?

Q: I am not accustomed to giving it to people.

Judge Rasin: Just a moment, Mr. Cooper. Mr. Thomas, the Court is advising you — now the Court —

A: You can tell the Court that I'm sorry.

Judge Rasin: Now wait a minute. The Court —

A: Dig it!

Judge Rasin: The Court knows you, and the Court has never seen you act in Court in the way in which you are acting today. Therefore I believe there is no reason for you to act in this manner. So the Court is now instructing you —

A: I have seen you act the way you're acting. So I'm now instructing you that I'm trying to act different from you. Dig it!

Judge Rasin: The Court is instructing you, that under its contempt power that you must conduct yourself as I have seen you conduct yourself in Court in the past. You must not

ask questions of the attorneys. You must answer the questions in a respectful manner and not volunteer any statements. Now you have had your warning —

A: I'm not volunteering. He asked me for — he asked me —

Judge Rasin: You have had your warning, Mr. Thomas. Now do you understand that?

A: Well the next time you are going to throw me in jail and beat me on my head again?

Judge Rasin: If you don't keep quiet —

A: You're going to throw me in jail and beat me on my head?

Judge Rasin: If you don't keep quiet and answer the questions the Court is going to deal with you as in contempt. Now go ahead, Mr. Cooper.

Q: When did you give this watch to Larry Moody?

A: Like the officer said up here. I don't know the exact date.

\* \* \*

Q: Do you remember where you were?

A: I can remember, but I don't remember.

Q: Would it have been at the dance at the roller rink?

A: I don't believe so.

Q: Do you remember the conversation you had with Larry Moody at the time he gave you the watch?

A: Let me see. Hear, man.

Q: Do you remember the conversation?

A: Hear man. There was a conversation. And then it ended. We split — broke up, later.

Q: Who asked — did he ask for the watch?

A: I had the watch on. Then I took the watch off again. He seen I wasn't wearing it, so he said, "Hey man, let me use your watch since you're not wearing it." Dig it!

Q: And he didn't give it back to you that evening, did he?

A: Before I could get it back, the police had stolen it from me."

590

The following morning the contempt hearing was held, and appellant testified in his own defense. The record discloses:

"CALVIN THOMAS, having affirmed he would tell the truth, being duly sworn, testified as follows:

Mr. Thomas: Good Evening, Mr. Rasin.

QUESTIONS BY MR. PARKS:

\* \* \*

Q: I show you these sticks marked Exhibit One for the State and ask you if you can identify these sticks?

A: Well, when I go to these dances, I beat these sticks together in rhythm with the music, because some people don't have any music. I just beat them together, because some people don't have any.

Q: Are they yours?

A: Yes, they are mine. I made them.

Q: And you made them for that purpose? To beat together?

A: Yes, and I am not going to lie, I also swing them around and practice with them, to keep my arms in shape.

Q: Did you ever intend to use these sticks as a weapon?

A: I don't need to use weapons, when I've got my God-given hands, and fists.

Q: Now when you came into Court yesterday, you were upset were you not? When you came in here to Court yesterday about three o'clock, you came in here and you were upset, were you not?

A: Well — how do I answer your question?

Q: Answer it "yes" or "no".

A: Yes or no. No, I was not upset.

Q: Now for what purpose did you come here yesterday?

A: I come here to be a witness because Larry Moody's brother tole me that someone was trying to frame him — I think it was Herzberg, who was trying to frame him into saying the watch was his, so I came in for a witness to tell him that the watch belonged to me.

Q: And what was your purpose for coming in here? Was there any other purpose you had to come here to tell the truth and to be a witness.

A: All I did was to tell the truth. Not to — whatever you call it — destruct justice or mess the Court up. I just come here to tell the truth, and I got locked up for telling the truth.

Q: Well now, you have been to Court before, have you not?

A: Yes, and I did act different.

Q: In juvenile cases?

A: Yes.

Q: You know something about the Court. Why did you stand up in the gallery, or make motions in the gallery?

A: I was sitting down, and I was rubbing my face, and bringing my arms down.

Q: Did you try to get anyone's attention?

A: It must have got somebody's attention, because they said I was doing things to mess the Court up.

Q: Now, when you made a statement to the Court that you wanted to be in Court, what did you mean by that? When you started to leave the Court and the Sheriff held you as a witness. You said that you wanted to be here, in this trial.

A: I wanted to be here. I wanted to be here as a witness.

Q: Why did you think that you couldn't be a witness?

A: That I couldn't be?

Q: Did you think they weren't going to call you as a witness?

A: If I was staying home I would be called as a witness. That's why I came. I thought if I was sitting in front of their face they would call me as a witness.

Q: Do you know whether or not the attorney for — what about Lawrence Moody? Or Anthony Moody?

A: Larry Moody? What did he do?

Q: Is he a friend of yours or not?

A: Yes.

Q: So you came here to help him? Is that what you came to do?

A: I came here to try to help him.

Q: Do you know whether or not you received any call from his attorney —

A: No.

Q: — or the Court to be here, to be a witness? Any summons, or any papers —

A: Repeat.

Q: — that told you to be here?

A: Repeat.

Q: Did you receive any papers or anything from the Court or from his attorney, or requests, asking you to be here to testify?

A: No, but somebody did ask me to testify.

Q: Who was that?

A: His mother.

Q: But you never were summonsed as a witness?

A: What does that mean — summons?

Q: Summons is when the Sheriff —

Mr. Cooper: I will stipulate he wasn't summonsed.

A: Okay man, I wasn't summonsed. I just came here.

Q: Don't argue with the State's Attorney, just answer my question. Had you had any kind of drugs yesterday — I know you answered it yesterday, but you can answer it again — were you under the influence of any pills?

A: No.

Q: Your mother said something about you going up to the Health Center to see a doctor. What was that about?

A: I went to see a doctor, because they told me that they wanted me to go down from the school, because I had been kicked out of school for talking back to a teacher.

Q: And you went up there to be examined by a doctor? Was that last Friday?

A: He was there. He was a little taller than I was.

Q: Did he have a funny accent? Did he talk funny?

A: No, he had a good American accent.

Q: Do you remember his name?

A: Not right off.

* * *

Q: Do you have any explanation you want to tell the Court as to why you were waving your hands around in Court, and why you were wiggling around and pointing?

Mr. Cooper: Mr. Parks, he has already given that explanation once.

A: Well he asked me the question. Can I answer him?

Judge Rasin: Go ahead and answer him.

A: Alright. Well, that's my regular procedure.

Q: What do you mean by your regular procedure?

A: Every day. I raise my hands and wipe my face. I do that every day.

Q: Were you doing this?

A: What?

Q: Like that?

A: No, but I did do like that.

Mr. Cooper: I also want to make the observation that the Court of Special Appeals won't know what we're talking about if we do like this and this and over here like this.

A: Or you don't want to hear that.

Q: This stuff is all taken down on tape and if it ever goes to the Court of Appeals, they are not used to seeing you — they take all of this down, and they can't see you waving your hands on this tape.

A: Well they can hear it can't they?

Q: They can't see you waving your hands on the tape.

A: I just want them to hear.

Q: Let the record show that Mr. Thomas put his hands over his eyes like he was wiping his eyes and covered his face, while he was testifying. Then when you waved, did you wave your hands parrallel to your face?

A: I was testifying.

Q: Did you wave your hands parrallel to your face?

A: I was testifying.

Q: The Judge testified that you waved your hands back and forth in front of your face, parrallel to your face, like the policemen do when they stop a car, or wave a car down.

A: To stop the criminal?

Q: When they stand out in the road and wave down cars and trucks. Did you do that? And if so, why?

A: I'm not going to call the Judge no liar, but I don't remember stopping them.

Q: Was it your intent to disrupt this Court when you came here?

A: As I said before, it was my intent to try to help another brother.

\* \* \*

CROSS EXAMINATION BY MR. COOPER:

Q: Calvin, do you remember yesterday, when you were on the stand as you are now — you do remember when you were on the stand and I was standing here, don't you? Do you remember that event?

A: Yes. I do remember.

Q: Do you remember looking to the jury and putting your second finger of your right hand underneath your nose, and then going straight up in the air like that, and then looking the jury right in the face? Do you remember that?

A: Repeat.

Q: That you looked at the jury while you were being talked to, you put your second finger underneath your nose, and you lifted your hand abruptly up over your head and face? Do you remember that?

A: I do remember, —

Q: Well, what type of procedure is that?

\* \* \*

A: I do remember putting my hand under my nose, but I must be absent-minded to remembe.˙ this.

Q: "This" meaning abruptly pulling your hand up and over your nose and over your face? You don't remember that?

A: I did put my hand under my nose.

Q: What was the problem?

A: The problem?

Q: Yes. Did you need to wipe your nose?

A: I do have waste up my nose.

Q: Okay.

A: And I have to stop it from falling down in Court.

Q: Calvin, it has been testified to before by your mother and by others, and by the Court, that this isn't the usual way that you act. Is there something you don't like about me?

A: I mean man — is there anything you don't like about me? Other than I'm black?

Q: You are asking —

A: Well ask me a question then. Repeat.

Q: I want you to answer my question.

A: I'm going to answer. Repeat.

Q: My question is, what is it, since everybody has testified that you don't normally act this way — the Court has observed that you —

A: What is it I don't like about white people?

Q: What is it you don't like about us here in this Court Room?

A: Is that on black and white? Or just white?

Q: Is that your problem?

A: My problem is prejudice, just like your problem is prejudice.

Q: And that is the reason why you have acted the way you have in the Court Room?

A: Man, when somebody hates me — I mean, how can I love them?

Q: Have I ever met you before?

A: Yes.

Q: When?

A: When I was sent to training school before. When I was punished, to go to training school.

Q: When?

A: Four or five years ago.

Q: I suppose then I stand corrected. There is probably a basis then why you don't like me.

\* \* \*

Judge Rasin: You may step down, Calvin.

A: Can I ask Mr. Cooper a question?

Judge Rasin: No. You may step down and take your seat alongside of your lawyer. . . ."

\* \* \*

Judge Rasin after finding appellant guilty of contempt of Court and sentencing him to 179 days in jail said:

"To repeat, this action is being taken not just to punish Calvin Thomas, but also to afford him some protection from himself, if in fact he needs that protection. And I don't know, since I am not a medical doctor. I only wish to assure Calvin that the fact that he is black and I am white has absolutely nothing to do with these proceedings.

Calvin Thomas: It doesn't?

Judge Rasin: I would have held the same proceedings had he been an indian, red, or had he been an oriental, yellow —

Calvin Thomas: A white man?

Judge Rasin: Or had he been —

Calvin Thomas: No white man?

Judge Rasin: — a brown man, a Philippino, or had he been a white person. The color has nothing whatsoever to do with whether one misbehaves or doesn't misbehave in the Court Room. And until my hands are tied by some Appellate decisions, I intend to see that no one, regardless of race, creed, color, sex, or age acts as Calvin Thomas acted in this Court Room yesterday, and again today . . . ."